UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| PARC LORRAINE CONDOMINIUM ASSOCIATION, | ) ) ) | |
| Plaintiff, | ) ) | |
| | ) | Case No. 4:24-cv-00228-SRC |
| v. | ) ) | |
| PHILADELPHIA INDEMNITY INSURANCE COMPANY, | ) ) ) | |
| Defendant. | | |

**Memorandum and Order**

In 2019, a wind-and-hail storm damaged Parc Lorraine Condominium Association's condominium complex. Parc Lorraine sought to receive the benefits of its insurance policy, but its insurer—Philadelphia Indemnity Insurance Company—refused to pay the full claim. Parc Lorraine sued Philadelphia Indemnity, asserting breach-of-contract and vexatious-refusal-to-pay claims. Now, Philadelphia Indemnity seeks summary judgment on the vexatious-refusal-to-pay claim.

**I.     Background**

The Court finds the following facts undisputed for purposes of summary judgment, most of which the parties agree are undisputed. The Court notes below the facts that the parties dispute.

Parc Lorraine owns and operates a condominium complex, in St. Louis, Missouri, that consists of multiple buildings. Doc. 54 at ¶ 5(b). Between January 1, 2019, and January 1, 2020, Parc Lorraine insured its condominium complex through Philadelphia Indemnity under a commercial insurance policy. *Id.* at ¶ 5(a). Around July 28, 2022, Parc Lorraine submitted a

claim under the policy regarding an alleged loss that it suffered at the condominium complex (damage to the buildings' roofs) as a result of a June 26, 2019 wind-and-hail storm. *Id.* at ¶¶ 5(d), 5(f); doc. 57 at ¶¶ 3, 6; doc. 61. Philadelphia Indemnity investigated Parc Lorraine's claim to determine if Parc Lorraine had suffered a loss under the policy. *See* doc. 54 at ¶¶ 5(e), 5(f). The parties agree that a covered loss occurred, *see id.* at ¶¶ 5(f); 5(h), but they "dispute the amount of the loss caused by the storm," *id.* at ¶ 5(i); *see also* doc. 57 at ¶¶ 28–29; doc. 61. Below, the Court finds facts regarding the policy and Philadelphia Indemnity's consideration of Parc Lorraine's claim.

### A.     The policy

The policy bore policy number PHPK1923583, doc. 57 at ¶ 1; doc. 61, and contained "various terms, conditions, provisions, limitations, and exclusions," doc. 54 at ¶ 5(c). The parties agree that the following portions of the policy are relevant to Philadelphia Indemnity's motion for partial summary judgment:

**PROPERTY COVERAGE FORM**

> Various provisions in this policy restrict coverage. Read this entire policy carefully to determine rights, duties and what is and is not covered.
>
> Throughout this Coverage Form the words **"you"** and **"your"** refer to the Named Insured shown in the Declarations. The words **"we"**, **"us"** and **"our"** refer to the Company providing this insurance.
>
> Other words and phrases that appear in quotation marks have special meaning. Refer to **Section G., Definitions.**
>
> **A.     Coverage**
>
>> We will pay for direct physical "loss" to Covered Property caused by or resulting from any of the Covered Causes of Loss.
>
> ***
>
> **E.     Loss Conditions**
> The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions:

2

***

**4. Loss Payment**

**a.** In the event of **"loss"** to Covered Property covered by this Coverage form, at our option, we will either:

    **(1)** Pay the value of lost or damaged property;
    **(2)** Pay the cost of repairing or replacing the lost or damaged property;
    **(3)** Take all or any part of the property at an agreed or appraised value; or
    **(4)** Repair, rebuild or replace the property with other property of like kind and quality.

***

**7. Valuation**

We will determine the value of Covered Property in the event of **"loss"** as follows:

    a. At replacement cost (without deduction for depreciation) as of the time of **"loss"**, except as provided in **b., c., d., e., f., g.**, and **h.** below.

        **(1)** We will not pay more for **"loss"** on a replacement cost basis than the least of:

            **(a)** The Limit of Insurance applicable to the lost or damaged property;

            **(b)** The cost to replace the lost or damaged property with other property:

                **(i)** Of comparable material and quality; and

                **(ii)** Used for the same purpose; or

            **(c)** The amount you actually spend that is necessary to repair or replace the lost or damaged property.

***<br>***

        **(2)** We will not pay on a replacement cost basis for any **"loss"**:

            **(a)** Until the lost or damaged property is actually repaired or replaced; and

            **(b)** Unless the repairs or replacement are made as soon as reasonably possible after the **"loss"**.

> If the repairs or replacement are not made as soon as reasonably possible after the **"loss"**, the value of the property will be actual cash value.
>
> \*\*\*
>
> **G.     Definitions**
>
> \*\*\*
>
> **7.**     **"Loss"** means accidental loss or damage.
>
> \*\*\*

\*\*\*

### CAUSES OF LOSS FORM

Words and phrases that appear in quotation marks have special meaning. Refer to Section **F., Definitions.**

**A.     Covered Causes of Loss**

**Covered Causes of Loss** means Risks of Direct Physical Loss unless the **"loss"** is:

1.     Excluded in Section **B., Exclusions**; or

2.     Limited in Section **C., Limitations**;

that follow.

**B.     Exclusions**

\*\*\*

2.     We will not pay for **"loss"** caused by or resulting from any of the following:
\*\*\*

    **d. (1)**     Wear and tear;

    **(2)**     Rust, corrosion, fungus, decay, deterioration, spoilage, contamination, hidden or latent defect or any quality in property that causes it to damage or destroy itself;
\*\*\*

3.     We will not pay for **"loss"** caused by or resulting from any of the following. But if **"loss"** by a Covered Cause of Loss results, we will pay for that resulting **"loss."**
\*\*\*

    **c.**     Faulty, inadequate, or defective:

4

\*\*\*

**(2)** Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

**(3)** Materials used in repair, construction, renovation or remodeling; or

**(4)** Maintenance;

Of part or all of any property on or off the described premises.

**\*\*\***

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

### WINDSTORM OR HAIL PERCENTAGE DEDUCTIBLE

This endorsement modifies coverage provided under the following:

**Property Coverage Form**

\*\*\*

The Windstorm or Hail Deductible, as shown in the Schedule, applies to direct physical **"loss"** to Covered Property, caused by or resulting from Windstorm or Hail, regardless of any other cause or event that contributes concurrently or in any sequence to the **"loss"** or damage. If **"loss"** from a covered weather condition other than Windstorm or Hail occurs, and that **"loss"** would not have occurred but for the Windstorm or Hail such **"loss"** shall be considered to be caused by Windstorm or Hail and therefore part of the Windstorm or Hail occurrence.

With respect to Covered Property at a location identified in the Schedule, no other deductible applies to Windstorm or Hail.

The Windstorm or Hail Deductible applies whenever there is an occurrence of Windstorm or Hail.

\*\*\*

**Windstorm or Hail Deductible Clause**

**A.** **All Policies**

    **1.** A deductible is calculated separately for and applies separately to:

        **a.** Each building, if two or more buildings sustain **"loss"**.

      **b.**      The building and to personal Property in that building, if both sustain **"loss"**.

      **c.**      Personal property at each building, if personal property at two or more buildings sustains **"loss"**.

      **d.**      Personal Property in the open.

**2.**      We will not pay for **"loss"** until the amount of **"loss"** exceeds the applicable Deductible.  We will then pay the amount of **"loss"** in excess of that Deductible up to the applicable Limit of Insurance, after any reduction required by any of the following:

      **a.**      Coinsurance Condition

      **b.**      Agreed Value Option Coverage

      **c.**      Reporting Endorsement

                              **\*\*\***

**B.**      **Calculation of the Deductible – Specific Insurance**
                              **\*\*\***

When we determine the amount, if any, that we will pay for "loss", we will deduct an amount equal to 1%, 2%, 3%, 4%, 5%, 6%, 7%, 8%, 9%, or 10% (as shown in the [Schedule]) or the Limit(s) of Insurance applicable to the property that has sustained **"loss"**.

Doc. 57 at ¶ 25 (quoting doc. 57-2 at 14, 28–29, 31, 36–38, 40, 42, 64–65 (The Court cites to page numbers as assigned by CM/ECF.)); doc. 61.

      **B.**      **Philadelphia Indemnity's consideration of the claim**

Around July 28, 2022, Parc Lorraine submitted an insurance claim relating to alleged damage that occurred as the result of the June 26, 2019 wind-and-hail storm.  Doc. 54 at ¶ 5(d); doc. 57 at ¶ 3; doc. 61.  "In support of its claim," Parc Lorraine submitted "an estimate prepared by Premier Roofing that estimated total repair costs of $1,741,950.65."  Doc. 57-3 at ¶ 11.  Philadelphia Indemnity then investigated Parc Lorraine's claim to determine whether a covered loss had occurred.  *See* doc. 54 at ¶¶ 5(e), 5(f).  Parc Lorraine "admits that Philadelphia" Indemnity "promptly acknowledged the claim" and that Philadelphia Indemnity "or its

representatives and experts conducted inspections over multiple days." Doc. 57 at ¶ 30 (citations omitted); doc. 61.

Philadelphia Indemnity's investigation began with its retaining of Michael Herishen, an independent adjuster at Engle Martin. Doc. 54 at ¶ 5(e); doc. 57 at ¶ 4; doc. 61. Around August 15, 2022, Herishen inspected the condominium complex. Doc. 57 at ¶ 5; doc. 61. Herishen "discovered minor hail indentations to various soft metals, but no hail or wind damage to the shingled roofs" at the condominium complex. Doc. 57 at ¶ 6 (citation omitted); doc. 61. He then reported his findings to Philadelphia Indemnity. Doc. 57 at ¶ 6; doc. 61. Herishen's findings differed from the Premier Roofing estimate that Parc Lorraine had submitted, so Philadelphia Indemnity "retained Professional Engineer Scott Cochran with Grayco Roofing Consultants, to complete an evaluation of the" condominium complex and to "assist in determining the cause of alleged damage to" it. Doc. 57 at ¶ 8 (citation omitted); doc. 61.

Like Herishen, Cochran inspected the condominium complex. Doc. 57 at ¶ 9; doc. 61. Cochran completed his inspection around October 4, 2022, and October 5, 2022, doc. 57 at ¶ 9; doc. 61, and then prepared a report that contained his "findings and observations regarding his inspections of each building and roof, his findings of sample area testing on each roof, his observations concerning weather data he reviewed, and his conclusions":

> In Grayco's professional opinion the composition shingles atop the subject structures exhibit very limited anomalies that are consistent with hailstone impact. There are few scattered individual anomalies that are circular/semi-circular with discrete granule loss and coincident bruising. However, the overwhelming anomalies observed, palpated, and closely evaluated were often found to be solid abrasions and manifestations of heat blistering and common wearing patterns and characteristics of composition roofing shingles.
>
> In Grayco's opinion, the asphalt composition shingles at the subject structures' mansards do not exhibit anomalies consistent with the hailstone impact. The mansards at the subject structures show no areas of granule loss with coincident bruising. Closer examination of isolated mansards revealed loose shingles with

7

> poor/failed sealant between adjacent courses.  In addition to the poor/failed sealants there were locations of poorly/improperly placed fasteners where the fasteners were placed within the sealant strips not allowing the shingles to properly seal.  There was also no evidence of hand sealing of the shingles on the mansards between adjacent courses.
>
> The asphalt composition shingles atop the subject structures exhibit very limited anomalies that are consistent with hailstone impact.  There are few scattered individual anomalies that are circular/semi-circular with discrete granule loss and coincident bruising.  Throughout the subject structures the extent of hail impact anomalies ranged between a minimum of zero (0) and a maximum of two (2) per square.
>
> Reviewed weather data revealed multiple storms at or near the community with the most recent storm occurring in June 2019.  Since June 2019 there have been no recorded hailstorms at or near (within 3-miles) of the subject structure.  Vent caps installed between March 2019 and September 2019 exhibited no indentations consistent with hailstone impact that would have occurred during the June 2019 event, therefore it is likely the hailstone impact anomalies occurred prior to the June 2019 storm events.
>
> The asphalt composition shingles at the subject structures' mansards do not exhibit anomalies consistent with hailstone impact.  The shingles at the mansards exhibit no areas of granule loss with coincident bruising of the shingles.
>
> The asphalt composition shingles atop the subject structures and within the mansards exhibit no damages consistent with exposure to high winds.  Within the mansards there are locations where shingles have slipped down from their originally installed positions as they were likely not properly installed (hand sealed) for the conditions.  At the mansards there are locations with isolated replaced shingles, likely due to slippage downslope due to gravity and poor installation and not wind force exposure.  At locations throughout the community there are locations where the shingles are not adhered to the course below at the butt joints.  This condition is not a result of wind as wind damage to shingles presents as torn, creased, and/or missing shingles.  Throughout the roofs and mansards there were not locations of torn, creased, and/or missing shingles that would be consistent with wind damage.

Doc. 57 at ¶¶ 10, 12 (citations omitted); doc. 61.  Philadelphia Indemnity "reviewed, considered, and relied upon . . . Cochran's report as a part of its claim investigation." Doc. 57 at ¶ 11 (citation omitted); doc. 61.

"Based on . . . Cochran's report, . . . Herishen prepared an estimate for repair of the hail damages found at the" condominium complex.  Doc. 57 at ¶ 13 (citation omitted); doc. 61. "Herishen's estimate contemplated repair costs for six of the 24 buildings" in the condominium complex.  Doc. 57 at ¶ 14 (citation omitted); doc. 61.  But "only one" of the six buildings had an estimated repair cost that "exceed[ed] the 1% wind and hail deductible."  Doc. 57 at ¶ 14 (citation omitted); doc. 61.  For the building that had a repair cost exceeding the deductible, Herishen estimated that the repair would cost $16,468.34 and that after the deductible, the net claim was $652.81.  *See* doc. 57-10 at 6; doc. 57 at ¶ 21; doc. 61.  Around "December 16, 2022, . . . Herishen provided" Parc Lorraine "with a copy of . . . Cochran's report and a repair estimate summary."  Doc. 57 at ¶ 15 (citation omitted); doc. 61.

In January 2023, Parc Lorraine's representatives and Herishen exchanged emails concerning Cochran's report.  Doc. 57 at ¶ 16; doc. 61.  Parc Lorraine's representatives "asked questions about the report," which Herishen answered.  Doc. 57 at ¶ 16 (citation omitted); doc. 61.  Around March 23, 2023, one of Parc Lorraine's representatives "confirmed to . . . Herishen that" Parc Lorraine "was no longer proceeding with the claim, and . . . Herishen confirmed that the file would be closed."  Doc. 57 at ¶ 17 (citations omitted); doc. 61.

The next month, Parc Lorraine contacted Anthony Rolfes, a public adjuster from Fulcrum Claims Consulting.  Doc. 57 at ¶ 18 (citations omitted); doc. 61; doc. 62 at 71.  Before Parc Lorraine contacted him, Rolfes had never been to Parc Lorraine's condominium complex. Doc. 62 at 71.  But he went to the condominium complex after being contacted to inspect it for hail damage.  *Id.* at 68, 71.  Rolfes inspected the condominium on multiple occasions and took photos of it.  *Id.* at 68, 83.  In May 2023, Rolfes sent Philadelphia Indemnity a letter indicating

9

that he was representing Parc Lorraine as a public adjuster.  Doc. 57 at ¶ 18 (citations omitted); doc. 61.

At an unknown time, but "[p]robably after [Rolfes's] first inspection after the submission of the" representation letter, Rolfes had a meeting with Herishen at the condominium complex. Doc. 62 at 83.  During that meeting, Rolfes requested that he and Herishen conduct a joint inspection of the buildings, but Herishen refused to do so.  *Id.* at 83–84; *see also* doc. 63 at 2. Herishen, according to Rolfes, explained that Grayco would need to be there to conduct a joint inspection and that in Philadelphia Indemnity's mind, Parc Lorraine's claim was closed.  Doc. 62 at 84–85; *see also* doc. 63 at 2.  Rolfes then asked Herishen to request a site visit with Grayco. Doc. 62 at 85; *see also* doc. 63 at 2.  Herishen communicated to Philadelphia Indemnity that Rolfes wanted to conduct a joint site visit, but Philadelphia Indemnity refused to do so and "didn't pay or hire Grayco to do it."  Doc. 62; *see also* doc. 63 at 2.

On or about June 26, 2023, Philadelphia Indemnity received Fulcrum's repair estimate, which estimated that repair costs would total $3,617,722.54.  Doc. 57 at ¶ 19; doc. 61.  Parc Lorraine asserts that the estimate included numerous photos that supported the estimate, doc. 61 at ¶ 19, but Philadelphia Indemnity claims that the portions of Rolfes's deposition testimony that Parc Lorraine cites don't support Parc Lorraine's assertion, doc. 63 at 1.  Rolfes's deposition testimony included the following:

> Q. Okay.  Is it correct that your estimated loss replacement cost value plus total paid when incurred figure here is $3,617,722.54?
>
> A. It is.
>
> Q. Okay.  Are all of the opinions you've been asked to express or give in this matter included in this report?
>
> A. With regard to replacement, yes, but there's also photos that we took that I can support the opinions with.

10

> Q. Okay. And those are not included?
>
> A. In the report?
>
> Q. In this document, correct.
>
> A. Correct.
>
> Q. Okay. But you're saying your firm, Fulcrum Claims Consultants, took photographs?
>
> A. We did.
>
> Q. Okay. And those are a part of your file?
>
> A. They should have been.
>
> . . . .
>
> Q. Okay. Did you do test square on each building?
>
> A. Yes.
>
> Q. Are those tests documented somewhere?
>
> A. In the photos, sir.
>
> . . . .
>
> Q. You said they were documented in the photos. Is the test squaring documented anywhere else?
>
> A. No, the photos would be the documentation.
>
> . . . .
>
> Q. I just want to confirm; are all of your opinions that you are giving in this matter reflected in this Written Report?
>
> A. As mentioned earlier with regard to that question, as well as the photos provided, yes. The photos and the estimate reflect my opinions.

Doc. 62 at 52, 59–60, 102. Thus, the cited material reflects that during his deposition, Rolfes initially testified that the photos weren't in the estimate, that the photos "should have been" part

11

of his file, and that his testing was documented in the photos, *id.* at 52, 59–60, but it also reflects that Rolfes later testified that his opinions are reflected in "the photos provided" and the estimate, *id.* at 102.  Viewing the evidence in the light most favorable to the non-moving party (Parc Lorraine), *AgriStor Leasing v. Farrow*, 826 F.2d 732, 734 (8th Cir. 1987), the Court finds that although the photos weren't in the estimate, Rolfes provided photos that support the estimate, doc. 62 at 52, 102.  The Court, however, cannot find based on the cited material to whom or when Rolfes provided the photos.  *See* doc. 62 at 52, 59–60, 83, 102–03.

Herishen "reviewed and considered" Fulcrum's repair estimate, and he "reported to Philadelphia" Indemnity that neither Fulcrum nor Parc Lorraine had provided any "additional or new information" that Herishen, Cochran, and Philadelphia Indemnity "had not already . . . considered."  Doc. 57 at ¶ 20; *see* doc. 61 at ¶ 20.  Parc Lorraine asserts that although Rolfes provided, in June 2023, photos that supported his estimate, Philadelphia Indemnity didn't provide the estimate or the photos to Cochran until after Cochran's February 2025 deposition for this case.  Doc. 61 at ¶ B.  But the emails that Parc Lorraine relies on to support this assertion don't do so.  The emails, which were exchanged between counsel in 2025, reflect that Cochran "reviewed the photographs taken by Fulcrum in May of 2023."  Doc. 62 at 169.  But that statement is ambiguous as to when Cochran reviewed the photos (were the photos taken in May of 2023, or did Cochran review them in May of 2023, or both?), and no other portion of the emails reflects when Cochran reviewed them.  *See id.* at 167–90.  Further, the emails don't reflect when Philadelphia Indemnity provided the photos to Cochran.  *See id.*  Nor do they reflect that Rolfes provided the photos in June 2023.  *See id.*  Thus, the Court sustains Philadelphia Indemnity's objection to Parc Lorraine's asserted fact.  Doc. 63 at 2; *see* Fed. R. Civ. P. 56(c)(2).

Philadelphia Indemnity relied upon Cochran's and Herishen's expertise and opinions as part of its claim investigation and in reaching its positions on Parc Lorraine's claim.  Doc. 57 at ¶ 26 (citation omitted); doc. 61.  Following its investigation, Philadelphia Indemnity "determined that a covered loss had occurred, and it valued the loss caused by the June 26, 2019 storm at a total repair cost of $73,483.03."  Doc. 54 at ¶ 5(f).  Based on Herishen's estimate, Philadelphia Indemnity "issued payment to" Parc Lorraine "in the amount of $652.81 for covered loss and damages" that exceeded the deductible.  Doc. 57 at ¶ 21 (citation omitted); doc. 61; doc. 57-10 at 6.

On August 4, 2023, Philadelphia Indemnity informed Parc Lorraine of its position on the claim.  Doc. 54 at ¶ 5(g).  Specifically, Philadelphia Indemnity emailed Rolfes explaining that it had issued the $652.81 payment, and it emailed Rolfes copies of Cochran's report, Herishen's estimate summary, and a letter from Philadelphia Indemnity.  Doc. 57 at ¶ 22; doc. 61.  The letter notified Parc Lorraine that Philadelphia Indemnity would not issue further payment and provided "the reasons and basis for the payment amount and the reasons and basis for Philadelphia[]" Indemnity's "positions on coverage under the [p]olicy."  Doc. 57 at ¶ 22 (citations omitted); doc. 61.  The letter specifically discussed that Philadelphia Indemnity had considered the Fulcrum estimate and that Herishen had "confirmed the Fulcrum repair estimate primarily include[d] roof, gutter, and downspout replacement throughout the community and that no additional or new information ha[d] been provided to suggest a difference of opinion from the engineer findings within the Grayco" report.  Doc. 62 at 8.

Nearly five months later, on December 28, 2023, Philadelphia Indemnity sent Parc Lorraine's counsel a letter advising counsel of Parc Lorraine's claim status and Philadelphia Indemnity's then-current coverage position.  *Id.* at 10.  The letter noted that "[a]fter thorough

13

review of Fulcrum's estimate, a response was communicated in writing on August 4, 2023," and that "[t]o date," Philadelphia Indemnity "ha[d] not received documentation to support the value stated in Fulcrum's estimate." *Id.* Further, the letter stated that "[t]o date," Parc Lorraine's counsel had "provided no documentation to contradict the findings of Grayco" and that "Fulcrum's unsupported estimate [was] not acceptable documentation to contradict the findings of Grayco." *Id.*

Finally, Parc Lorraine asserts as a fact that Philadelphia Indemnity "changed its claim decision/identified a new claim after . . . Cochran reviewed" its "2023 claim documents in February of 2025." Doc. 61 at ¶ C (citing doc. 62 at 167–90, which contains emails that the parties' counsel exchanged in 2025 regarding the parties' current views on the insurance claim and regarding depositions). But Philadelphia Indemnity objects, arguing that the cited material doesn't support the fact, isn't admissible, and is irrelevant to whether Philadelphia Indemnity vexatiously refused to pay. *See* doc. 63 at 2, 7–8; Fed. R. Civ. P. 56(c)(2).

Under Missouri law, the relevant question for a vexatious-refusal-to-pay claim concerns an insurance company's conduct at the time that the claim was presented and the insurance company denied the claim. *See, e.g.*, *Wunsch v. Sun Life Assurance Co. of Can.*, 92 S.W.3d 146, 153 (Mo. Ct. App. 2002) (explaining that the plaintiff "must provide evidence that" the insurance company's "refusal to pay the loss—at the time it was asked to pay—was willful and without reasonable cause" (quoting *Pace Props., Inc. v. Am Mfrs. Mut. Ins. Co.*, 918 S.W.2d 883, 888 (Mo. Ct. App. 1996)). The 2025 emails shed no light on whether Philadelphia Indemnity vexatiously refused to pay in 2022 and 2023. *See* doc. 62 at 167–90. Moreover, the emails do not support Parc Lorraine's assertion that Philadelphia Indemnity changed its view on the claim regarding the 2019 storm: "In short, Philadelphia[] [Indemnity's] position regarding the extent

14

of damage caused by the June 2019 storm has not changed." *Id.* at 169.  Thus, the Court sustains Philadelphia Indemnity's objection.  *See* doc. 63 at 2, 7–8; Fed. R. Civ. P. 56(c)(2).

**II.     Standard**

Rule 56(a) of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  In ruling on a motion for summary judgment, the Court is required to view the evidence in the light most favorable to the non-moving party and must give that party the benefit of all reasonable inferences to be drawn from the underlying facts.  *AgriStor*, 826 F.2d at 734.  The moving party bears the initial burden of showing both the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); Fed. R. Civ. P. 56(a).

In response to the proponent's showing, the opponent's burden is to "come forward with 'specific facts showing that there is a genuine issue for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis removed) (quoting Fed. R. Civ. P. 56(e)).  Self-serving, conclusory statements without support are insufficient to defeat summary judgment.  *Armour & Co. v. Inver Grove Heights*, 2 F.3d 276, 279 (8th Cir. 1993).  Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

### III. Discussion

Philadelphia Indemnity moves for summary judgment on Parc Lorraine's vexatious-refusal-to-pay claim. Doc. 55. As explained, the Court denies Philadelphia Indemnity's motion.

Under Missouri Revised Statute § 375.420, a plaintiff suing an "insurance company to recover the amount of any loss under a policy of . . . insurance except automobile liability insurance[] . . . may, in addition to the amount thereof and interest," recover "damages not to exceed twenty percent of the first fifteen hundred dollars of the loss, and ten percent of the amount of the loss in excess of fifteen hundred dollars and a reasonable attorney's fee" if "it appears from the evidence that such company has refused to pay" the "loss without reasonable cause or excuse." It's "well-settled that for an insured to" succeed on its vexatious-refusal-to-pay claim, "the insured must show that the insurance company's refusal to pay the loss was willful and without reasonable cause or excuse, as the facts would have appeared to a reasonable person before trial." *Watters v. Travel Guard Int'l*, 136 S.W.3d 100, 108 (Mo. Ct. App. 2004) (citations omitted).

"There may be no vexatious refusal where the insurer has reasonable cause to believe and does believe there is no liability under its policy and it has a meritorious defense." *Id.* at 109 (citation omitted). Further, "[w]hen there is an open question of law or fact, the insurance company may insist upon a judicial determination of those questions without being penalized." *Id.* (citation omitted). Even so, "[t]he existence of a litigable issue, either factual or legal, does not preclude a vexatious penalty where there is evidence that the insurer's attitude was vexatious and recalcitrant." *DeWitt v. Am. Fam. Mut. Ins. Co.*, 667 S.W.2d 700, 710 (Mo. 1984) (citations omitted).

Here, Philadelphia Indemnity contends that it had reasonable cause to believe that it had no liability under the policy to pay the full claim regarding the 2019 storm and that it has a meritorious defense. Doc. 56 at 7–18. In response, Parc Lorraine asserts that Philadelphia Indemnity didn't have reasonable cause because Philadelphia Indemnity failed to conduct an adequate investigation. Doc. 60 at 6–10. Specifically, Parc Lorraine claims that (1) Philadelphia Indemnity "did not take any further action to investigate the [l]oss even after it was provided with new and additional information from" Parc Lorraine's "public adjuster[] at Fulcrum" (its estimate and photos) and (2) Philadelphia Indemnity "continued to refuse to take any action even though" Parc Lorraine's "public adjuster expressly requested an inspection with" Philadelphia Indemnity's engineer, Cochran. *Id.* at 9.

Upon review of the record and the parties' arguments, the Court finds that it cannot resolve Parc Lorraine's vexatious-refusal-to-pay claim as a matter of law. *Watters*, 136 S.W.3d at 109 ("Generally, a question of reasonableness is a question of fact for the jury rather than a question of law for the court. But, the question of reasonableness can be determined as a matter of law based upon undisputed facts." (citation omitted)).

As found above, Herishen (Philadelphia Indemnity's hired public adjuster) and Cochran (Philadelphia Indemnity's hired engineer) conducted inspections in 2022. Doc. 54 at ¶ 5(e); doc. 57 at ¶¶ 5, 9; doc. 61. Parc Lorraine retained a public adjuster (Rolfes from Fulcrum), in 2023, who submitted an estimate of repair costs to Philadelphia Indemnity. Doc. 57 at ¶¶ 18–19; doc. 61. Rolfes's estimate differed significantly from Herishen's estimate. Doc. 57 at ¶¶ 13–15, 19; doc. 61. At some point, either before or after submitting his estimate, Rolfes requested to go on the roofs of the buildings with Herishen to conduct a joint inspection, but Herishen denied that request. Doc. 62 at 83–85. Rolfes also requested a joint site visit with Cochran. *Id.* But

17

Philadelphia Indemnity denied that request and refused to hire Cochran to do the joint site visit. *Id.*

Earlier this year, a court in this district concluded that summary judgment was improper on a vexatious-refusal-to-pay claim that presented a similar factual scenario. In *Goebel & Co. Furniture, LLC v. Cincinnati Insurance Co.*, the plaintiffs sued their insurance company after it refused to pay the full amount of their claim for damage that their property suffered from a hail-and-wind storm. No. 4:22-cv-00036-AGF, 2025 WL 1489487 (E.D. Mo. May 23, 2025). Throughout the claim review, both parties had retained companies to inspect the property and provide estimates on the damage and repair costs, but those companies didn't agree. *Id.* at *2–3. In its summary-judgment motion, the insurance company asserted that the court should enter summary judgment because it (the insurance company) had "reasonably relied on its experts to deny the roofing damage claims." *Id.* at *10. The court disagreed:

> At this stage, the Court cannot resolve the remaining vexatious refusal claims as a matter of law. While Defendant is entitled to insist on a judicial determination as to the cause and extent of the roofing damage, viewing the facts and all reasonable inferences in light most favorable to Plaintiffs (as this Court must), evidence exists from which a reasonable jury may conclude that Defendant's refusal to pay was vexatious and recalcitrant. For example, a reasonable jury could draw this conclusion based on the timing and history of Defendant's expert inspections, when compared to Plaintiffs' hired experts' findings of hail and wind damage, as well as Defendant's own expert's conclusion that "further investigation [was] necessary" and that "localized repairs should not be dismissed without more detailed analysis." Def.'s Resp. to Pls.' SOF, ECF No. 98 at 16-17. *See, e.g.*, *Refrigeration Supplies, Inc. v. Acadia Ins. Co.*, 507 F. Supp. 3d 1096, 1105–06 (E.D. Mo. 2020) ("Given the timing, number and history of the inspections, when combined with reports from Acadia's own hired experts which found hail damage, a reasonable jury might well conclude that Acadia was simply unwilling to pay for the damage to RSI's roofs . . . ."). Although Defendant maintains that its investigation was reasonable, that does not render the issue undisputed.

*Id.* at *11 (alteration in original).

18

Viewing the evidence in this case in the light most favorable to Parc Lorraine, the Court reaches the same conclusion as the *Goebel* court. A reasonable jury could find that Philadelphia Indemnity did not conduct an adequate investigation because further investigation, such as a joint inspection of the buildings, was necessary in light of Rolfes's estimate. The difference between Rolfes's estimate and Herishen's estimate calls into question the accuracy of Herishen's estimate and therefore whether Philadelphia Indemnity's reliance on Herishen's estimate, without further investigation, was reasonable. Further, a reasonable jury could conclude that Philadelphia Indemnity's refusal to complete a joint inspection when Rolfes requested to do so evidences that Philadelphia Indemnity vexatiously refused to pay in full Parc Lorraine's claim. *Id.* When, such "as here, there is evidence that the insurer's reliance on the results of an investigation is not reasonable, the question is for the jury." *Russell v. Farmers & Merchants Ins. Co.*, 834 S.W.2d 209, 221 (Mo. Ct. App. 1992) (citations omitted). Thus, the Court denies Philadelphia Indemnity's motion for summary judgment on Parc Lorraine's vexatious-refusal-to-pay claim. Doc. 55.

**IV.     Conclusion**

For these reasons, the Court denies Philadelphia Indemnity Insurance Company's [55] Motion for Partial Summary Judgment as to Count II of Plaintiff's First Amended Complaint.

So ordered this 7th day of July 2025.

_____
STEPHEN R. CLARK
CHIEF UNITED STATES DISTRICT JUDGE